UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RANDALL BENDERSON and
BENDERSON DEVELOPMENT
COMPANY, LLC,
                      Plaintiffs,
     v.                                    DECISION AND ORDER
                                        14-CV-96S

NORTHWEST SAVINGS BANK,
                          Defendant.

---

## I.    INTRODUCTION

Plaintiffs Randall Benderson and Benderson Development Company, LLC (together, "Benderson") brought this breach of contract action against Defendant Northwest Savings Bank ("Northwest") in the Supreme Court for the State of New York, Erie County. Northwest removed the action, asserting federal diversity jurisdiction under 28 U.S.C. § 1332(a). Presently before this Court is Northwest's motion for summary judgment, seeking dismissal of the case. For the following reasons, the motion is denied.

## II.    BACKGROUND[1]

Plaintiff Randall Benderson is the president of Plaintiff Benderson Development Company, LLC. Thomas K. Creal IV is a vice-president of Defendant Northwest. In July 2013, Benderson contacted Creal about the possibility of purchasing certain notes and

---

[1] For the sake of brevity and clarity, this Court will recite only those facts pertinent to the pending motion. The facts are drawn from the parties' Rule 56 Statements of Facts and the attached exhibits, and are undisputed unless otherwise noted.

1

mortgages worth approximately $4,000,000 and secured by a property at 3770 Union Road in Cheektowaga, New York.

Before opening negotiations, Benderson entered into a Confidentiality Agreement with Northwest, whereby both parties agreed to keep the discussions secret. The Confidentiality Agreement, which was executed by Benderson and Creal on July 31, 2013, states, in relevant part:

> "WHEREAS, Northwest and the Recipient are exploring the possible sale of loans and of certain other assets of Northwest (the "Project")"
>
> * * *
>
> "SECTION 4. Neither party will disclose to any person or entity the fact that the Confidential Information has been made available, that discussions or negotiations are taking place or have taken place between the parties concerning a possible sale or any of the terms, conditions, or other facts with respect to any such possible sale, including the status thereof."

(Docket No. 60-1 ("Confidentiality Agreement") at 1-2.) Benderson told Creal that he was concerned about news of the negotiations reaching Paul F. Rosa, who was the president of the company that owned the property, for fear that Rosa would attempt to scuttle the deal. Earlier that year, Benderson Development had purchased the mortgage on a different property belonging to Rosa and had begun foreclosure proceedings when Rosa fell behind on payments. Because the foreclosure had resulted in a significant loss of money to Rosa personally, Benderson feared Rosa would attempt to prevent the sale if he discovered that Benderson was negotiating to purchase the notes and mortgages on the 3770 Union Road property.

Between August and December 2013, Benderson and Creal continued negotiations. However, at some point before November 13, 2013, Creal revealed to Rosa that Benderson was interested in purchasing the notes and mortgages. Specifically,

2

Creal asked Rosa a question that "disclosed . . . Benderson had made an offer for the mortgage." (Docket No. 57-3 ("Creal Dep.") at 126.) This is memorialized in a November 13, 2013 email from Rosa to Creal, in which Rosa stated that Creal had "mentioned that Benderson had come to [Northwest] regarding purchasing the mortgage." (Docket No. 59-1.) In the same email, Rosa told Creal that he had found a potential purchaser, and emails later in November 2013 show contact between Northwest and Fred Hanania, a local real estate investor, initiating discussions regarding the notes and mortgages. It would appear that Rosa's attempts to find a buyer were spurred by Benderson's interest in the notes and mortgages, because Rosa has affirmed that he refinanced the mortgages held by Northwest in 2012, and that Northwest had led him to believe that he would be secure at the Union Road property until at least 2014. Rosa has also stated that, after he learned of Benderson's interest in the notes and mortgages, he "took steps to protect [his] interests" by actively seeking a different investor because he worried that Benderson would force him to part with the property under unfavorable terms, as he had for the other property. (Docket No. 59 at ¶¶ 15-17.)

On December 3, 2013, Benderson became aware of Creal's disclosure when Rosa emailed that he knew Benderson was calling Creal "every week asking to buy the mortgage on Union Rd." (Docket No. 60-2.) Benderson contacted Creal, who admitted that he had told Rosa of Benderson's interest in the notes and mortgages, but that he did not think that Northwest was bound by the Confidentiality Agreement. Although Benderson was upset that Creal had revealed his interest to Rosa, he continued to work with him in the hopes of completing the purchase.

3

In addition to his communications with Hanania, Rosa has stated that he also spoke with his stepson, Dean Rallo, telling him that he was "willing to sell the Union Road property to anyone for the right price." (Docket No. 59 at ¶ 18.) In his deposition, Rallo testified that he did not recall having spoken to Rosa about the business, and that he did not even think it possible that Rosa would have shared information regarding the potential sale of the property or the notes and mortgages with him. (Docket No. 44 (Rallo Dep.) at 37-38.) Rallo also testified that he did not recall relaying any information regarding Rosa's business or property to Raymour & Flanigan ("Raymour"), where Rallo worked at the time. However, Raymour's 30(b)(6) witness testified that Raymour first heard about the potential investment in 3770 Union Road from Rallo. According to Raymour, Rallo spoke to Raymour's CEO, Neil Goldberg, at a company breakfast during the 2013 Christmas holiday season and informed him that the Rosa family's furniture store was having trouble. Raymour "focused in" on the mortgages after this conversation, so presumably sometime in December 2013. (Docket No. 57-11 (Fumarola Dep.) at 17-18.) The email records appear to support this, as the first written communications between Northwest and Raymour regarding a potential deal took place on December 17, 2013, and Raymour's representative testified these emails were prompted by Rallo's discussion with Goldberg. However, Raymour's representative also testified that it was not aware that Benderson was interested in the notes and mortgages until it was informed about this lawsuit. Indeed, Rosa has stated that he "did not disclose Benderson's negotiations with Northwest for the purchase of the notes and mortgages" to Rallo or anyone associated with Raymour. (See Docket No. 44, Exh. 6 at ¶¶ 3-4.) Northwest contends that, although Creal told Rosa about Benderson's interest in the notes and mortgages, Creal did not

4

pass on any other information to Rosa, and Rosa, in turn, did not pass confidential information to Rallo or any other party.

One day prior to Raymour's first communications with Northwest, on December 16, 2013, Benderson reached an oral agreement with Northwest for a purchase price of $3,050,000. Although the parties orally agreed that the deal should close as soon as possible, Northwest's attorneys failed to respond to requests from Benderson's attorneys to move forward. Instead, Northwest entered separate negotiations with Raymour on December 17, 2013, and reached an oral agreement on December 18, 2017, for a purchase price of $3,500,000. On December 30, 2013, the day that Raymour's purchase closed, Creal called Benderson to inform him that Northwest would not be selling him the notes and mortgages.

## III. DISCUSSION

Benderson initially brought two claims against Defendants Northwest and Creal. By Decision and Order dated July 8, 2015, this Court dismissed the first count of the Complaint, as well as all claims against Creal. (Docket No. 14.) Northwest has now moved for summary judgment as to the remaining claim for breach of the Confidentiality Agreement, arguing that Benderson cannot provide evidence that the alleged breach resulted in harm. Benderson opposes the motion, and has requested that this Court grant summary judgment in his favor as to the existence of a valid contract and Northwest's breach.

### A. Preclusion of Rosa Declaration

In its reply, Northwest requested that the Court disregard and strike from the record the causation theory set forth in Benderson's opposition and the August 3, 2016 Rosa

Declaration submitted therewith, contending that these were not disclosed in discovery. "Because a decision . . . to strike may affect [a party's] ability to prevail on summary judgment, it is appropriate to consider" such a request prior to addressing the summary judgment motion. See Pugliese v. Verizon N.Y., Inc., No. 05-CV-4005 (KMK), 2008 WL 2882092, at *5 (S.D.N.Y. July 9, 2008) (internal quotations and citation omitted).

Northwest argues that this Court should disregard the theory of causation set forth in Benderson's Opposition because it differs from the theory set forth in the Complaint and initial discovery disclosures, and Benderson did not update those disclosures to reflect the new theory. However, Benderson's theory appears to have been set forth, at least in broad strokes, in the deposition of Benderson's Rule 30(b)(6) witness, Stephen Scalione. Accordingly, and because there is significant overlap with the theory set forth in Benderson's Complaint, this Court will not disregard the causation theory set forth in Benderson's opposition papers.

Northwest also requests that this Court disregard or strike the Rosa Declaration. Northwest appears to request this as a discovery sanction, noting that the declaration was signed on August 3, 2016—while fact discovery was ongoing—but was not produced to Northwest until Benderson filed the declaration together with his opposition to Northwest's motion for summary judgment in January 2017. Northwest argues that this late disclosure prevented it from raising questions regarding Rosa's assertions with witnesses who were deposed after the declaration was signed.

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was

6

substantially justified or is harmless." In deciding whether evidence should be precluded under Rule 37(c), courts in this circuit generally consider the following four factors:

> (1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (internal quotation omitted). However, because Northwest did not file a motion to strike, and instead made a one-paragraph request in its reply, this Court is not in a position to assess the relevant factors. The parties have not briefed the issue—Benderson has not given an explanation as to why he did not produce the Rosa Declaration at the time that it was signed, and Northwest has not made a showing of harm. Nor has Northwest shown when Benderson actually received the declaration. Although it was signed in August 2016, there is no evidence before this Court to suggest that Benderson had possession of the declaration prior to preparing his Opposition papers.

Because this Court cannot make a determination as to whether discovery sanctions are appropriate, the request is denied and the Rosa Declaration will be considered.

**B.    Motion for Summary Judgment**

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The movant has the burden of proving that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317,

323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). For there to be a genuine issue of material fact, there must be enough evidence "that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (quotation omitted). Once the movant has properly made a motion for summary judgment, it is the non-movant's duty to respond and "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). In evaluating the evidence, a court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

Pursuant to the terms of the Confidentiality Agreement, it is governed by Pennsylvania law.[2] "It is well-established that three elements are necessary to plead a cause of action for breach of contract [under Pennsylvania law]: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 635 Pa. 427, 445, 137 A.3d 1247, 1258 (Pa. 2016). Northwest's motion challenges the third element, specifically causation, arguing that Benderson cannot present evidence that Creal's revelation of information to Rosa resulted in Raymour's

---

[2] The Confidentiality Agreement provides that "Pennsylvania law governs the validity, legality, and construction of this Agreement or any of its provisions . . . ." (Confidentiality Agreement at 3). This Court's decision resolving Northwest's motion to dismiss analyzed the contract under New York law. (See Docket No. 14 at 6 n. 3.) This was appropriate both because of the parties submissions relied on New York law, and because "New York and Pennsylvania law are in agreement as to the essential elements of a breach of contract claim." In re Cavalier Indus., Inc., No. 00-0180, 2001 WL 423028, at *3 (Bankr. E.D. Pa. Apr. 6, 2001) (citing Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996); CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999).

8

purchase of the mortgage. Benderson opposes the motion and requests that this Court grant summary judgment as to the first two elements.

1. Existence of the Contract and Breach

Benderson requests that this Court grant summary judgment under Federal Rule of Civil Procedure 56(f)(1) and (2) as to the elements that Northwest's motion did not challenge: existence of the contract and breach. "A motion for summary judgment searches the record, and it is well settled that if such a search reveals that there are no genuine issues of material fact, but that the law is on the side of the *non-moving* party, then summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion under Rule 56." Montgomery v. Scott, 802 F. Supp. 930, 935 (W.D.N.Y. 1992) (internal quotation marks and citations omitted) (emphasis in original). Neither party argues that the existence of the Confidentiality Agreement is a fact in dispute, and the record supports a finding that the Confidentiality Agreement was a valid contract under Pennsylvania law. Accordingly, Benderson's request is granted as to the first element.

However, Northwest contends that Benderson is not entitled to summary judgment on the issue of breach. The Confidentiality Agreement prohibited both parties from disclosing "the fact . . . that discussions or negotiations are taking place or have taken place between the parties concerning a possible sale or any of the terms, conditions, or other facts with respect to any such possible sale, including the status thereof." (Confidentiality Agreement at 2.) Northwest argues that Creal revealed only that Benderson had an interest in the mortgage, and that "[d]isclosing the existence of an 'interest' is different than disclosing the existence of 'discussions' or 'negotiations.'"

9

(Docket No. 67 ("Def.'s Reply") at 10.)  However, in his deposition, Creal stated that he "disclosed [to Rosa] that Randy Benderson had made an offer for the mortgage."  (Creal Dep. at 126:7-8.)  This is confirmed by a contemporaneous email from Rosa, in which he stated that "Benderson had come to [Creal] regarding purchasing the mortgage."  (Docket No. 57-6, Exh. G to Connors Decl.)

An offer is one of the "essential elements of contract formation," Tokio Marine & Fire Ins. Co. v. Fed. Marine Terminal, Inc., 397 F. Supp. 2d 530, 535 (S.D.N.Y. 2005), and is therefore generally a critical step in negotiations.  But even if the offer was not considered to be a part of "negotiations," the Confidentiality Agreement also bars disclosure of "discussions" of a "possible sale" (Confidentiality Agreement at 2), which would certainly include an interested party's offer to purchase.  Even drawing all reasonable inferences in Northwest's favor, this Court must conclude that Creal's disclosure of an offer was a clear violation of the Confidentiality Agreement.

Accordingly, because Northwest has not raised an issue of material fact that would enable a reasonable jury to conclude that Creal's disclosure to Rosa was not in violation of the Confidentiality Agreement, this Court finds that the element of breach has also been proven.

   2. Causation

Although this Court has granted summary judgment as to the first two elements, recovery on a breach of contract claim also requires a plaintiff to prove "a causal connection between the breach and the loss."  Logan v. Mirror Printing Co. of Altoona, Pa., 410 Pa. Super. 446, 448, 600 A.2d 225, 226 (Pa. Super. Ct. 1991).  Under Pennsylvania law, such evidence must show that the damages are the proximate

consequence of the breach, "not merely remote or possible." National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987) (internal quotation omitted). "In essence, the proximate causation requirement demands that the plaintiff prove that the defendant's breach was a substantial factor in causing some harm." Id.; see also Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 681 (3d Cir. 1991). "Because the determination of proximate cause often depends on the resolution of factual questions and inference, the issue of whether the defendant's breach proximately caused the plaintiff's injury is usually a question of fact for the jury, unless there is no genuine issue of material fact." Eisenberry v. Shaw Bros., No. CIV.A. 3:08-1337, 2010 WL 3191845, at *4 (M.D. Pa. Aug. 11, 2010), aff'd 421 F. App'x 239 (3d Cir. 2011).

Northwest argues that Benderson has not presented evidence of causation, because Rosa stated that he did not share Benderson's interest in the notes and mortgages with Rallo or anyone associated with Raymour, and that Benderson's theory as to how "the information imparted to Mr. Rosa 'could have' made its way to Raymour" was therefore based on speculation and circumstantial evidence. (Docket No. 44-3, Def.'s Mem. of Law at 13.) However, that argument seems to have been made before Northwest was aware of the declaration that Rosa provided to Benderson, in which Rosa stated that he spoke to Rallo about selling his property after Creal's breach of the Confidentiality Agreement in an attempt to "protect [his] interests" and "arrange a better deal that [he] thought [he] would receive if Northwest sold the mortgages without [his] involvement." (Rosa Decl. at ¶¶ 16-18.) This statement provides direct evidence from which a jury might find that Creal's breach was a substantial factor of Raymour's interest in, and later consummation of, the purchase of the notes and mortgages.

In its reply, Northwest leans into the theory that, even if Rosa shared information with Rallo that was relayed to Raymour, Raymour was not aware that Benderson was interested in the notes and mortgages before it struck a deal with Northwest. However, even if Raymour was not aware that Benderson specifically was interested in purchasing the notes and mortgages, Benderson has presented sufficient circumstantial evidence to raise a triable issue of fact as to whether Creal's breach spurred Raymour's pursuit of the notes and mortgages. See generally Hamil v. Bashline, 481 Pa. 256, 266, 392 A.2d 1280, 1285 (Pa. 1978) ("Normally a plaintiff may establish his case of causation with any evidence, direct or circumstantial, which tends to show defendant's actions as the legal cause of his harm."); Stamper-Murray v. U.D.H. Mgmt. Corp., No. 1:14-CV-1360, 2015 WL 3840937, at *4 (M.D. Pa. June 22, 2015) ("Proximate cause need not be proved by direct evidence; a plaintiff may use circumstantial evidence to do so."). Such evidence includes the speed with which the Raymour transaction took place—only two weeks from offer to closing—which could suggest that Raymour was attempting to beat out other potential purchasers.

Indeed, Northwest's reply relies heavily on factual, rather than legal, arguments, contending that Rosa's financial problems were well-known in the community and that Rosa only discussed the property with Rallo after Raymour had developed an independent interest in the deal. (Def.'s Reply at 6.) But there is no conclusive evidence presented by either side as to the timeline. Benderson cannot definitively state that Rallo brought the sale to Raymour's attention after speaking to Rosa, or that Raymour only became interested in the notes and mortgages after Rosa had spoken to Rallo. However, he has presented evidence that Creal told Rosa about Benderson's offer to buy the notes,

that Rosa sought a different investor, that Rosa then spoke to Rallo, and that Rallo relayed the potential deal to Raymour.  Further, Raymour did ultimately purchase the notes, and that sale closed just two weeks after Benderson thought he had reached an agreement with Northwest.  To the extent that Northwest has presented conflicting facts, this Court cannot resolve factual conflicts on a motion for summary judgment.  See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (noting that the role of the court is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'") (quoting Anderson, 477 U.S. at 249).

This Court finds that there are triable issues of fact as to whether Creal's disclosure proximately caused Benderson's damages because, viewing the record in the light most favorable to Benderson, the evidence presented could be sufficient for a reasonable jury to conclude that Northwest's breach of the Confidentiality Agreement resulted in Benderson's losses.  Accordingly, Northwest's motion for summary judgment is denied.

## IV.     CONCLUSION

This Court finds that Benderson has raised material disputed facts as to causation, and that Defendant's motion to dismiss must therefore be denied.  Further, this Court finds that Benderson has established the existence of a valid Confidentiality Agreement, and that Northwest breached that agreement when it revealed the negotiations to Rosa.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant Northwest's Motion for Summary Judgment (Docket No. 40) is DENIED.

SO ORDERED.

Dated: October 16, 2017
        Buffalo, New York

                                              /s/William M. Skretny
                                              WILLIAM M. SKRETNY
                                              United States District Judge